**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Carboun and Karen Carboun, husband and wife, | ) CV-03-2146-PHX-DGC |
| Plaintiffs, | ) |
| v. | ) **ORDER** |
| The City of Chandler, a body politic; Bobby Joe Harris, a former police chief of the City of Chandler Police Department, and Jane Doe Harris, husband and wife; Pat McDermott, assistant city manager of the City of Chandler, and Jane Doe Harris, husband and wife, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment (Doc. #171), Defendants' Motion for Summary Judgment Re Count I (First Amendment) (Doc. #173), Defendants' Motion for Summary Judgment Re Counts IV, VI, VII, IX, XI, XII, and Punitive Damages (Doc. #174), Defendants' Motion for Summary Judgment Re Quasi-Judicial Immunity for Defendant McDermott (Doc. #175), Defendants' Motion for Summary Judgment Re Counts VIII and X (Doc. #176), Plaintiff's Motion to Strike Expert Witness Ken Katsaris and Motion to Strike Portions of Defendants' Statement of Facts (Doc. #182), Defendants' Motion to Strike Wilson Supplemental Report (Doc. #210), and the parties' motions to strike statements of fact (Doc. ## 183, 211).

1   The briefing in this case has been extensive, including some 15 inches of briefs,
2   statements of fact, and supporting exhibits.  The Court has relied on the arguments made
3   in the parties' briefs and their citations to the record.  The Court is not obligated to, and
4   has not, scoured the statements of fact or exhibits for evidence or arguments not identified
5   in the briefs.  *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028-29 (9th Cir. 2001);
6   *Keenan v. Allan*, 91 F.3d 1275, 1278-79 (9th Cir. 1996); *Forsberg v. Pac. N.W. Bell Tel. Co.*,
7   840 F.2d 1409, 1417-18 (9th Cir. 1988).

8   The parties requested oral argument.  The Court will not grant oral argument.  The
9   parties' briefing are extensive and the Court concludes that additional argument will not
10  aid its decisional process.  *See Mahon v. Credit Bur. of Placer County, Inc.*, 171 F.3d 1197,
11  1200 (9th Cir. 1999).

12  **Background**

13  Plaintiff John Carboun is a Chandler police officer and former president of the
14  Chandler Law Enforcement Association ("CLEA").  On June 19, 2002, shortly after the
15  death of Chandler Police Officer Robert Nielsen, Plaintiff submitted a letter to Chandler City
16  Manager Donna Dreska (the "Letter").  Officer Nielsen died when his patrol vehicle, a Ford
17  Crown Victoria, was involved in an accident and became engulfed in flames.  Plaintiff's
18  Letter was written on CLEA letterhead.  *See* Plaintiff's Statement of Facts ("PSOF") Ex. 1.
19  The Letter recounted Officer Nielsen's death and suggested that Plaintiff, who had arrived
20  at the scene shortly after the accident, had been unable to provide aid to Officer Nielsen
21  because Plaintiff and other officers had not been issued fire extinguishers.  *Id.*  The Letter
22  expressed concerns regarding the safety of Crown Victorias, the police administration's
23  lack of response to the need for new ballistic vests, the administration's budget-based
24  decision concerning safer holsters, and the administration's general disregard for officer
25  safety.  *Id.*

26  At approximately the same time he sent the Letter, Plaintiff engaged in a discussion
27  in the police department's briefing room concerning Nielsen's death.  Those present
28  describe the discussion as heated and Plaintiff's comments as highly emotional.  *See*

1    Defendants' Separate Statement of Facts ("DSOF") ¶¶ 4-7.  Plaintiff suggested during the

2    discussion that Police Chief Bobby Joe Harris had not been forthcoming about Officer

3    Nielsen's death.  *Id.* ¶ 5.  Other officers present during the exchange were upset by

4    Plaintiff's comments.  *Id.* ¶ 7.

5         Upon receiving Plaintiff's Letter, City Manager Dreska requested that Police Chief

6    Harris investigate Plaintiff's allegations.  A substantial internal investigation ensued,

7    involving several officers and numerous interviews.  *See* DSOF ¶¶ 30-37.  Upon receiving

8    the results of the investigation, Chief Harris issued a notice of termination to Plaintiff.  The

9    termination decision was based on Chief Harris' conclusion that Plaintiff's Letter included

10   several false or misleading statements, including that officers were not issued fire

11   extinguishers, that the administration had not been responsive on the issue of protective

12   vests, and that the administration was trying to cover up facts related to an earlier officer

13   death.  *See* DSOF Ex. 37.  Chief Harris provided the following explanation to Plaintiff in the

14   termination notice:

15        Your statements in the letter to the City Manager impacted the operation of
          the Police Department and were made for the sole purpose of bringing
16        discredit on the Police Department, the administration, and its employees.
          You purposely used the tragic death of a fellow officer and false statements
17        to discredit the department at a time when all employees were feeling this
          loss.

18   *Id.*

19        Plaintiff appealed the Chief's termination decision to the City's five-member Merit

20   Board.  *See* PSOF ¶ 17.  Three days of evidentiary hearings were held.  *See* PSOF 19.

21   Plaintiff, Chief Harris, the lead investigator into Plaintiff's Letter, and others testified.  *Id.*;

22   DSOF Ex. 38.  Plaintiff and the City were represented by counsel who presented evidence,

23   questioned witnesses, and made opening and closing arguments.  *See* PSOF 19.  Following

24   the hearing, the Board recommended by a 4-to-1 vote that Plaintiff not be terminated, but

25   that he be suspended for 80 hours without pay.  *Id.*  The Board provided the following

26   explanation:

27        Although the Board does not charge Mr. Carboun with dishonesty, the
          Board does find that he is guilty of conduct unbecoming an officer
28        (personnel rule 5, b-12400.d.3.h).  The timing of Mr. Carboun's letter, penned

3 days after the tragic death of Officer Nielsen, was inappropriate.  The Board understands that Mr. Carboun was angry over the death of his friend. However, he either knew or should have known that the timing, tone and shotgun approach of his letter would serve to further divide the Department rather than bring it together as was his stated mission in the letter.  In addition, it was clear that Mr. Carboun penned the letter on behalf of himself rather than the [CLEA].  For that, the Board finds Mr. Carboun guilty of conduct unbecoming a police officer.

DSOF Ex. 38.  The Board stated that Plaintiff's outburst in the briefing room "played little, if any, role in the Board's decision-making process."  *Id.*

The recommendation of the Merit Board was reviewed by Assistant City Manager Pat McDermott, a Defendant in this case.  Mr. McDermott was assigned to conduct the review because the City Manager, Donna Dreska, had been the recipient of Plaintiff's Letter.  Defendant McDermott accepted the Board's recommendation of suspension, but increased the suspension to 160 hours without pay.  *See* PSOF ¶ 27.[1]  McDermott provided the following explanation to Plaintiff:

To utilize the death of Officer Nielsen to highlight and restate your ongoing disagreements with Police Administration was, at best, extremely tasteless. Your letter included hearsay statements, exaggerations, generalizations, subjective opinions, and misstatements, and combined with the circumstances of Officer Nielsen's death demonstrated very poor judgment and behavior on your part.

DSOF Ex. 40.  McDermott found that Plaintiff had violated five department rules, including engaging in conduct which might bring discredit to the City service, conduct unbecoming an employee, and lack of respect for supervisors and department employees.  *Id.*

Plaintiff filed a 12-count complaint in Maricopa County Superior Court stemming from the actions of Chief Harris, the Board, and Assistant Manager McDermott.  Doc. #1. Defendants removed the action to this Court.  *Id.*  Plaintiff alleged in his complaint that Defendants' actions constituted unlawful retaliation for exercise of his First Amendment rights, violation of federal and state OSHA laws, and a number of state-law wrongs,

---

[1] Defendants move to strike Paragraph 27 on the ground that it contains a misleading recitation of the facts.  The Court will deny the motion.  It is undisputed in this case that Plaintiff ultimately received a 160-hour suspension without pay.

1  including unlawful reprisal, discrimination, wrongful discharge, intentional infliction of

2  emotional distress, false light invasion of privacy, negligent infliction of emotional distress,

3  defamation, breach of the implied covenant of good faith and fair dealing, and intentional

4  interference with contract.

5      On April 26, 2004, the Court granted Defendants judgment on the pleadings with

6  respect to Counts 2 and 3 of Plaintiffs' complaint.  Doc. #32.  On November 19, 2004, the

7  Court granted Defendants judgment on the pleadings with respect to Count 5, subsection

8  (c) of Paragraph 32 of Count 6, and on any termination claims relating to Counts 9 and 11

9  of Plaintiffs' complaint.  Doc. #131.

10                                    **Discussion**

11     Defendants move for summary judgment on all of Plaintiff's remaining claims.

12  Plaintiff moves for summary judgment on his First Amendment claim.  In conjunction with

13  these motions, both parties have filed motions to strike relating to the summary judgment

14  briefing.  The Court will address each of Plaintiff's remaining claims in turn and, where

15  appropriate, any related motion to strike.

16  **I.    Count 1 – First Amendment.**[2]

17     Both sides move for summary judgment on Plaintiff's First Amendment claim.

18  Plaintiff asserts that Defendants violated his First Amendment rights by terminating and

19  then suspending his employment in retaliation for writing the Letter, and that there are no

20  questions of fact precluding the Court from entering judgment in his favor.  Defendants

21  argue that Plaintiff's termination and suspension were not based on the content of the

22

23  [2] In his motion, Plaintiff attempts to assert a First Amendment freedom of association claim.

24  Defendants object on the grounds that Plaintiff made no such claim in his complaint and

25  the Court excluded the issue of Plaintiff's April 2000 denial of promotion to sergeant.  The

    Court agrees with Defendants.  A fair reading of Plaintiff's complaint reveals no freedom

26  of association claim and no allegations regarding the promotion events in 2000.

    Furthermore, the Court ruled in January 2005 that the "2000 selection process is not part

27  of the claims asserted by Plaintiff in this case, is remote in time, and is not similar to the

28  retaliatory conduct that has been asserted in the case."  Doc. #151.

Letter, but instead were based on Plaintiff's offensive, disruptive, and dishonest behavior; that the Letter is not entitled to First Amendment protection because it does not address matters of "public concern"; that the balancing test established by *Pickering v. Board of Education*, 391 U.S. 563 (1968), requires a conclusion that Plaintiff's First Amendment rights were not violated; that there is no basis for municipal liability against the City for Plaintiff's firing; and that qualified immunity shields Defendants Harris and McDermott from liability. The Court will address whether Defendants' actions were based on the Letter, whether the Letter constituted protected speech, and whether a First Amendment violation occurred under the *Pickering* test.

**A.    Was Plaintiff Fired Because of the Letter?**

Defendants argue that Plaintiff was not disciplined because of the content of the Letter. They claim instead that Plaintiff's termination and suspension were based on false assertions in the Letter, the disruptive effect of Plaintiff's actions, and the timing and tone of the Letter. Plaintiff disagrees, asserting that the content of the Letter was a substantial motivating factor in his discipline. Plaintiff notes that the internal investigation was initiated because of the Letter and that Chief Harris' termination decision, the Board's suspension recommendation, and Mr. McDermott's final suspension decision were all based on the Letter.

These competing positions present a factual dispute that cannot be resolved by summary judgment. Whether the timing, tone, falsity and effect of the letter motivated Defendants' action, or whether their actions were based on content protected by the First Amendment, must be resolved by the trier of fact. "As with proof of motive in other contexts, this element of a First Amendment retaliation suit . . . involves questions of fact that normally should be left for trial." *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2000) (citations omitted).

**B.    Is the Letter Protected Under the First Amendment?**

Defendants argue that the Letter does not sufficiently address matters of public concern to garner First Amendment protection. The Court disagrees. "If an employee's

expression relates to an issue of 'political, social, or other concern to the community,' as distinct from a mere personal grievance, it fairly is characterized as addressing a matter of public concern." *Gilbrook v. City of Westminster*, 177 F.3d 839, 865 (9th Cir. 1999) (quoting *Connick v. Myers*, 461 U.S. 138, 146-47 (1983)).  The Supreme Court in *Connick* concluded that a multi-part questionnaire which asked only one question of public concern sufficiently "touched upon" matters of public concern to warrant at least limited First Amendment protection and require the balancing set forth in *Pickering*.  461 U.S. at 149.

Plaintiff's Letter concerns matters of officer safety arising from ballistic vests, patrol cars, and holsters.  Although not addressed to the public at large, the Letter's concerns for officer safety and police management clearly are matters of public concern that warrant at least partial First Amendment protection.  *See Cochran v. City of Los Angeles*, 222 F.3d 1195, 1201 (9th Cir. 2000) (holding that expressions of concern about management of a police department "are relevant to the public's evaluation of its police department" and therefore raise matters of public concern); *Burgess v. Pierce County*, 918 F.2d 104, 105-06 (9th Cir. 1990) (holding that a fire marshal's comments regarding fire safety regulations touched on a matter of public concern); *Gillette v. Delmore*, 886 F.2d 1194, 1197-98 (9th Cir. 1989) (holding that a firefighter's statement regarding the manner in which firefighters and police had performed their duties involved a matter of public concern).  Because the Letter was not addressed to the public, did not raise political issues, and addressed issues that had been a matter of personal dispute between Plaintiff and Defendants for some time, it raises only a "limited First Amendment interest," as was the case in *Connick*.  *See* 461 U.S. at 154.

### C.   *Pickering* Balancing.

Under the balancing test established in *Pickering*, the Court must determine whether Defendants' legitimate administrative interests outweigh Plaintiff's First Amendment rights.  The Court must balance "the interests of the [employee], as a citizen, in commenting on matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

1    *Pickering*, 391 U.S. at 568.  "In conducting this balancing, courts must give government

2    employers 'wide discretion and control over the management of [their] personnel and

3    internal affairs.  This includes the prerogative to remove employees whose conduct hinders

4    efficient operation and to do so with dispatch.'" *Brewster v. Board of Educ.*, 149 F.3d 971,

5    979 (9th Cir. 1998) (quoting *Connick*, 461 U.S. at 151).  Although the *Pickering* inquiry

6    requires evaluation of factual matters unique to this case, the "balancing test is a question

7    of law, not fact." *Loya v. Desert Sands Unified School Dist.*, 721 F.2d 279, 281 (9th Cir.

8    1983); *Nicholson v. Board of Education*, 682 F.2d 858, 865 n. 8 (9th Cir. 1982).

9        The Court has considered a variety of factors argued by the parties.  "Because the

10   *Pickering* balance necessarily involves a fact-sensitive inquiry involving the totality of the

11   circumstances, no single factor is dispositive." *Gilbrook*, 177 F.3d at 868.  Several factors

12   are relevant.

13       First, Plaintiff wrote the Letter only three days after Officer Nielsen's death, when

14   emotions within the department and City administration were running high.  The Letter

15   clearly implied that Officer Nielsen's death was attributable to the policies of the police

16   department and that leadership of the department had attempted to cover up facts

17   concerning a previous officer death.  The Letter received considerable attention within the

18   department, a not-surprising fact given the notoriety of Officer Nielsen's death, even being

19   published on an employee-related website. DSOF ¶ 151.  The Letter was written to the City

20   Manager, not to Plaintiff's line officers within the department, arguably undercutting the

21   authority of those officers.  These facts lead the Court to conclude that the Letter carried

22   the potential to impair the "discipline, esprit de corps, and uniformity" of the Chandler

23   police department needed "to insure adequate promotion of safety of persons and

24   property." *Kannisto v. San Francisco*, 541 F.2d 841, 843 (9th Cir. 1976).  The Ninth Circuit

25   has noted that a police department is "a quasi-military organization." *Cochran*, 222 F.3d

26   at 1201.  "Discipline and esprit de corps are vital to its functioning." *Id.*  The Letter ran

27   counter to those interests.  *See Gilbrook*, 177 F.3d at 868 (courts inquire into whether the

28   speech "impaired discipline and control by superiors").

1       Second, the Letter caused the City Manager to institute a substantial internal

2   investigation.  *See* PSOF ¶ 11; DSOF ¶¶ 28, 29.  The investigation involved several

3   members of the department and numerous interviews.  *See* DSOF ¶¶ 30-37.  Such an

4   investigation consumes resources and distracts attention from the daily business of police

5   work, carrying the potential for hindering the effective operation of the department.  *See*

6   *Brewster*, 149 F.3d at 979 (employers may "remove employees whose conduct hinders

7   efficient operation").

8       Third, the timing and tone of the Letter, along with its suggestion that department

9   policies were responsible for Officer Nielsen's death, carried the potential to disrupt the

10  workplace and employee morale.  Plaintiff contends that no such disruption occurred.

11  Defendants disagree and point to Plaintiff's disruptive outburst in the briefing room. The

12  evidence suggests that the briefing room incident did have a disruptive effect.  Indeed,

13  Plaintiff made the following concession in his deposition: "If they want to punish me for

14  venting my feelings and my belief in the briefing room, then you know what, I'd be willing

15  to concede to them saying that I was out of line there."  DSOF Ex. 2 at 186.

16      Plaintiff does not, however, base his First Amendment claim on comments he made

17  in the briefing room.  And although Chief Harris cited that incident as part of the basis for

18  his termination decision, the Merit Board expressly noted that it was given little if any

19  consideration.  The Court may consider the briefing room outburst as part of the totality

20  of the circumstances relevant in the *Pickering* analysis, but it need not rely on this event.

21  The Ninth Circuit has held that "public employers need not allege that an employee's

22  expression actually disrupted the workplace; 'reasonable predictions of disruption' are

23  sufficient."  *Brewster*, 149 F.3d at 979 (quoting *Waters v. Churchill*, 511 U.S. 661, 673

24  (1994)).  The Court concludes that Plaintiff's Letter carried with it the potential of

25  disrupting the workplace, a potential Defendants were entitled to take into account.

26      Fourth, Plaintiff made statements in the Letter without factual foundation.  Plaintiff

27  stated that he was unable to aid Officer Nielsen because "there are no extinguishers issued

28  to our police vehicles."  PSOF Ex. 1.  The evidence in the record suggests that fire

extinguishers were issued and that individual officers were responsible for ensuring that their cars were properly equipped, DSOF ¶ 39, 40, although there was also evidence that some officers at some times had difficulty procuring extinguishers, PSOF Ex. 38. More importantly, the evidence shows that police officers at the scene of Officer Nielsen's death attempted to control the fire with extinguishers from their patrol cars, but that the extinguishers had no effect on the gasoline-fueled inferno. *See* DSOF ¶¶ 40, 14. Plaintiff would have witnessed these attempts if he was, as he claimed, "one of the first officers at the scene," but he made no mention of these facts in the Letter, implying instead that Officer Nielsen died for want of fire extinguishers. *See* PSOF, Ex. 1; DSOF ¶ 40.[3] Plaintiff also appears to have exaggerated or lacked foundation for the statements that "the administration informed everyone during a 'mandatory' briefing that Officer Nielsen died on impact," *see* DSOF ¶ 44, and that "the administration fought [the ballistic] vest proposal every step of the way," see DSOF ¶ 57.[4] Public employers are entitled to respond to inaccurate statements by employees. *Gilbrook*, 177 F.3d at 868 (courts consider "whether the statement was false or made in reckless disregard of the truth").

Fifth, as noted above, Plaintiff's speech is entitled to only limited First Amendment protection. The speech did not concern matters of politics and was not addressed to the electorate. Plaintiff directed the Letter to the City Manager. This limited speech weighs less heavily in Plaintiff's favor than speech on public issues directed to the public at large. *See Brewster*, 149 F.3d at 981 ("We have acknowledged that a narrow, limited focus and [a] limited audience weigh against [a] claim of protected speech" (quotation omitted)).

---

[3] Plaintiff moves to strike Paragraph 40 on the ground that it misstates the evidence. The Court has reviewed the underlying evidence and finds that it supports Defendants' interpretation. The Court will deny the motion to strike.

[4] Plaintiff moves to strike Paragraph 57 on the ground that it is argumentative and unsupported by the record. The Court has reviewed the underlying evidence and finds that it supports Defendants' interpretation of the facts. The Court will deny the motion to strike.

1    Sixth, although Chief Harris initially terminated Plaintiff's employment, the City

2    modified its discipline after a hearing before the Merit Board and review by Assistant

3    Manager McDermott.   The resulting suspension constituted a more measured response

4    by the City to Plaintiff's Letter.   The nature and severity of the employer's response is

5    certainly relevant in deciding whether the City violated Plaintiff's First Amendment rights.

6    Plaintiff counters the foregoing considerations by arguing that several factors weigh

7    in his favor: (1) he is not a high-ranking official subject to additional scrutiny, (2) the Letter

8    did not threaten any of Plaintiff's close working relationships, (3) the Letter did not impair

9    Plaintiff's performance of his duties, and (4) Defendants have not shown that the Letter

10   actually created any division in the Department.   Plaintiff's first three arguments are true,

11   but the Court does not find that they outweigh the considerations set forth above.   And

12   as already noted, Defendants need not show that the Letter created actual division within

13   the Department; the potential for division is enough. *Brewster*, 149 F.3d at 979.

14   The *Pickering* balancing analysis is not easy.   It requires the Court to weigh time-

15   honored notions of free speech, a hallmark of our democracy, against the legitimate need

16   of public employers to control their workforce and promote efficiency, discipline, and

17   safety among vital public employees.   Instinct would teach that we rarely if ever should

18   curtail free speech, but it is equally obvious that the efficient and disciplined operation of

19   our law enforcement agencies is critical to the safety and security of society.   Courts are

20   given the unenviable task of weighing theses competing interests and deciding when free

21   speech rights must yield to the needs of the public employer.

22   On the unique facts of this case, the Court concludes that the interests of Plaintiff

23   in writing the Letter are outweighed by the interests of Defendants "in promoting the

24   efficiency of the public services [they] perform[] through [their] employees." *Pickering*,

25   391 U.S. at 568.   The Letter was written at a time of high emotion over the tragic death of

26   Officer Nielsen, deliberately used that death as a catalyst for points Plaintiff wished to

27   make, failed to state some facts related to Officer Nielsen's death accurately, necessitated

28   a substantial and time-consuming investigation, and circumvented Plaintiff's line

1    supervisors.   The Letter was written to a limited audience, included Plaintiff's personal

2    feelings, and is entitled to only limited First Amendment protection.   Defendants' ultimate

3    response of a 160-hour suspension was more measured than Chief Harris' initial decision

4    and was imposed under procedures that comported with basic notions of due process.

5    Given the totality of these circumstances, the Court concludes that the *Pickering* balance

6    favors Defendants and that Plaintiff therefore cannot assert a claim for violation of his First

7    Amendment rights.   In reaching this conclusion, the Court is mindful of its obligation to

8    give government employers wide discretion and control over management of internal

9    affairs. *Brewster*, 149 F.3d at 979.

10       The Court will grant Defendants summary judgment on Plaintiff's First Amendment

11   claim and the corresponding claim for punitive damages.   The Court also notes that it

12   would find Defendants entitled to qualified immunity on Plaintiff's First Amendment claim

13   because, for the very reasons set forth in the balancing analysis above, it could not

14   conclude that Defendants violated "clearly established" First Amendment rights.

15   *Brewster*, 149 F.3d at 979 ("Because, under *Pickering*, the determination whether an

16   employee's expression is constitutionally protected requires a fact-sensitive,

17   context-specific balancing of competing interests, the law regarding public-employee free

18   speech claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified

19   immunity under *Harlow* and its progeny" (quotation omitted)).[5]

20   **II.        Counts 8 and 10 – False Light and Defamation.**

21       Defendants move for summary judgment on Plaintiff's defamation and false light

22   claims.   Plaintiff does not respond to Defendants' motion regarding false light, instead

23   defending only his defamation claim.   The Court will therefore grant Defendants summary

24   judgment on Count 8. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (holding

25   that summary judgment is appropriate against a party who "fails to make a showing

26

27   _____

28   [5] Given the Court's First Amendment ruling, it need not address the issues of municipal
liability or whether the Brady list constituted an adverse employment action.

1    sufficient to establish the existence of an element essential to that party's case"); Fed. R.

2    Civ. P. 56(e). ("If the adverse party does not so respond, summary judgment, if appropriate,

3    shall be entered against the adverse party").

4        Plaintiff bases his defamation claim on Defendant Harris' alleged statement to Paul

5    Babeau, a prospective department employee, that Plaintiff is a "liar."   Defendants move for

6    summary judgment on the grounds that (1) the statement was merely an opinion, (2)

7    Plaintiff has not presented sufficient evidence that the statement was false, and (3) Plaintiff

8    has not shown actual malice by Harris in making the statement.[6]

9        Plaintiff acknowledges that he is a public figure and that he must therefore prove

10   with clear and convincing evidence that Harris acted with malice.  *See* Plaintiff's Response

11   to Defendants' Motion for Summary Judgment re Counts VIII & X (Defamation Claim),

12   dated April 11, 2005, at 4.  The clear and convincing standard of proof must be considered

13   in ruling on Defendants' motion for summary judgment.   Plaintiff must present evidence

14   from which a reasonable jury could find that the proof of actual malice is clear and

15   convincing.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).  *See also Dombey v.*

16   *Phoenix Newspapers, Inc.*, 724 P.2d 562, 576 (Ariz. 1986) (evidence must permit a

17   reasonable jury to find "actual malice" with "convincing clarity").   This is a substantial

18   burden.   Plaintiff must produce "'significant probative evidence.'" *Id.* (quoting *Anderson*,

19   477 U.S. at 249, 256).

20       Plaintiff makes two arguments.  He asserts that the Merit Board's finding that

21   Plaintiff made no knowingly false statements in the Letter put Harris on notice that his

22   description of Plaintiff as a liar was either untrue or reckless.  Plaintiff further asserts that

23   Harris' longstanding ill-will towards Plaintiff supports a finding that he acted with malice.

24

---

25   [6] Plaintiff has abandoned his original allegations based on statements made to Jennifer
26   Rome, Larry Roe, and Daryl Palmer and on the pre-dismissal, dismissal, and reinstatement
     letters written by Defendants Harris and McDermott.  Likewise, Plaintiff does not pursue
27   his claim regarding Harris' statement that Plaintiff is a "bad officer."  The Court will grant
28   summary judgment on these statements.  *See Celotex*, 477 U.S. at 322-23.

1    This evidence would be sufficient to overcome summary judgment if the relevant

2    substantive standard was a preponderance of the evidence; a jury reasonably could

3    conclude from this evidence that it is more probable than not that Harris acted with actual

4    malice.   But the Court cannot conclude that a reasonable jury could be clearly convinced

5    from this evidence that Harris acted with malice.   The Merit Board issued a split decision,

6    voting 4-to-1.   Pat McDermott was aware of the Merit Board ruling and nonetheless

7    concluded in his suspension decision that Plaintiff's Letter included "exaggerations" and

8    "misstatements."   *See* PSOF ¶ 40.   As noted above, there is evidence that calls into

9    question the veracity of some assertions made by Plaintiff in the Letter, and Chief Harris

10   could have disagreed with the Merit Board's conclusion.   Moreover, the Merit Board

11   hearing and decision were limited to the Letter and did not address Harris' finding in the

12   termination notice that Plaintiff had been "untruthful" during a 1995 internal investigation.

13   *See* DSOF Ex. 37, at 3.[7]

14        Plaintiff cites *Lewis v. Oliver*, 873 P.2d 668 (Ariz. Ct. App. 1993) and *Dombey* to

15   support his arguments.   In *Lewis*, however, an investigation completely exonerated the

16   plaintiff and found the accusations against him "meritless."   873 P.2d at 673.   The court

17   concluded that the defendant's continued accusations following the plaintiff's vindication

18   evinced malice because the defendants knew that the accusations were false.   *See id.*   In

19   *Dombey*, the court recounted an extensive record which demonstrated that the defendant

20   newspaper ignored facts clearly and repeatedly presented in letters for retraction.   *See* 724

21   P.2d at 575.   Plaintiff's evidence does not contain such clear and convincing evidence that

22   Harris knew his statement was false or uttered it in reckless disregard for the truth.

23        Because Plaintiff has not met his summary judgment burden with respect to the

24

25   ───────────────

[7] Plaintiff's Statement of Facts in Response to Defendants' Motion for Summary Judgment
("PRSOF"), which is 94 pages and 299 paragraphs in length, is not cited by Plaintiff as

26   evidence of Harris' malice, but it does discuss the 1995 incident.   The PRSOF alleges that
Assistant City Attorney McNeff, who drafted the termination notice, had no personal

27   knowledge of the 1995 incident.   *See* PRSOF ¶ 153.   The cited paragraph says nothing,

28   however, about a lack of knowledge on the part of Harris.

1   actual malice component of his defamation claim, the Court will grant summary judgment.

2   **III.      Count 5 – Whistleblowing**.

3   Plaintiff claims that Defendants violated A.R.S. § 38-532, Arizona's whistleblowing

4   statute, by disciplining him for the Letter.   The statute states that "[i]t is a prohibited

5   [action] . . . to take reprisal against an employee for a disclosure of information of a matter

6   of public concern by the employee to a public body which the employee reasonably

7   believes evidences:  1.  A violation of any law.  2.  Mismanagement, a gross waste of

8   monies or an abuse of authority."  A.R.S. § 38-532 (A).

9   Defendants argue that the Letter cannot be considered whistleblowing because

10  issues raised for personal vindictiveness are not protected and Plaintiff raised the issues

11  only to "make the City look bad."  Def. Mot. at 5.   Issues of fact preclude such a

12  conclusion.   The Court must view the evidence in Plaintiff's favor at this summary

13  judgment stage, and Plaintiff states several times in the Letter that his goal is to improve

14  police officer safety.  *See* PSOF Ex. 18.   The Court cannot conclude as a matter of

15  undisputed fact that Plaintiff wrote the letter solely for personal vindictiveness.[8]

16  Defendants contend that Plaintiff did not reasonably believe the accusations he

17  made in the Letter, citing to evidence that the statements were exaggerated, poorly

18  supported, or based on hearsay or his own subjective opinion.   Plaintiff, however, has

19  produced evidence that he had substantial foundation for some of the issues he raised,

20  including the  issue of bladders in the Crown Victoria.  *See* PSOF ¶ 49.[9]  The Court cannot

---

22  [8] In their reply brief, Defendants raise the additional issue that Plaintiff does not have

23  evidence that Defendants acted against him with the requisite state of mind (malice, for this

claim).  Defendants make this argument with respect to Plaintiff's wrongful discharge, good

24  faith and fair dealing, and punitive damages claims as well. The Court will not address this

25  argument with respect to any of the claims because it was not raised in the original motion

and Plaintiff has not had an opportunity to respond.

26

27  [9] Defendants move to strike Paragraph 49 on the grounds that it is immaterial and

inflammatory.   The Court will deny the motion.  The paragraph tends to show that Plaintiff

28  had a foundation for concerns and possible cures regarding the Crown Victoria.   The

1   conclude as a matter of law that Plaintiff did not have a reasonable belief regarding at least

2   some of the issues he was raising.   The jury will assess the reasonableness of Plaintiff's

3   beliefs at trial.[10]

4        Defendants argue that Plaintiff's Letter deserves no protection because it raised no

5   novel issues, citing evidence that the Chandler administration had already discussed the

6   vest, holster, and Crown Victoria issues.   The Court finds no basis in Arizona law for

7   concluding that the issues must be novel in order for the disclosure to receive protection

8   under the Arizona statute.   The cases cited by Defendants relate to federal whistleblowing

9   statutes that have their own language and supporting case law.   Nothing in the language

10  of A.R.S. § 38-532(A) suggests that the issues must be novel, and Defendants cite no

11  Arizona law supporting that contention.

12       Finally, Defendants argue that Plaintiff has no evidence of causation – evidence that

13  Defendants terminated and suspended him because of his disclosures.   Arizona cases have

14  not established the level of evidence necessary to prove causation under the statute.   The

15  Court finds the inquiry into causation essentially an inquiry into Defendants' motivations

16  for disciplining Plaintiff.   For the reasons stated in Section I.A above, factual issues

17  preclude summary judgment on the question of Defendants' motivations.   Defendants'

18  motion for summary judgment on the whistleblowing claim will be denied.

19  ───────────────

20  Court's November 15, 2004 decision does not preclude Plaintiff from using evidence

21  regarding the Crown Victoria where it is relevant to claims at issue in this case.

22  [10] The Court's conclusion in the *Pickering* analysis that some statements in the Letter

23  lacked factual foundation is not the same as concluding as a matter of law that Plaintiff
    believed his statements to be untruthful for purposes of the state-law whistleblowing claim.

24  The *Pickering* analysis must be performed by the Court, not the jury, and public employers
    have an interest in responding to inaccuracies even if they are not fully intentional.   The

25  Court therefore was not required to decide the question of Plaintiff's intent in the

26  *Pickering* analysis.   Moreover, public employees must also recognize that disruption can
    result from less than fully accurate statements, critical of management, made in an

27  emotional environment.   Factual issues in the whistleblowing claim, by contrast, must be

28  resolved by the jury.

**IV.   Count 6 – Wrongful Discharge**.

Plaintiff claims that the City of Chandler violated the Arizona Employment Protection Act ("EPA"), A.R.S. § 23-1501(3)(b), by terminating him in violation of the whistleblowing statute.   Defendants move for summary judgment on the grounds Plaintiff was suspended, not terminated by the City, and that Plaintiff was not a whistleblower and has no evidence that he was terminated for whistleblowing.

Although the Court understands that Plaintiff eventually was reinstated and received 160 hours of suspension, the record suggests beyond dispute that Plaintiff was terminated, even if only briefly.   Defendants' Statement of Facts expressly states that "Plaintiff Was Terminated." *See* DSOF § F, at 25.   Chief Harris' notice of October 10, 2002, states that Plaintiff's actions "warrant . . . dismissal from . . . service with the City of Chandler."   DSOF Ex. 37.   Defendants cite no evidence in support of their argument that they did not terminate Plaintiff. *See* Defendant's Motion for Summary Judgment, dated February 25, 2005, at 8; Defendant's Reply, dated May 23, 2005, at 9.   Nor do they contend that the termination never took effect.   Thus, even though it is undisputed that Plaintiff eventually was reinstated and suspended, it appears equally clear that the Plaintiff was in fact terminated.   Defendants provide no authority for the proposition that Plaintiff's termination does not trigger the EPA because it was later replaced by a suspension, and the Court has found none.

The Court likewise disagrees with Defendants' claim that Plaintiff cannot sustain his whistleblower claim.   As discussed in greater detail above, Plaintiff's Letter disclosed public issues and a jury could reasonably infer from the circumstances that Defendants fired Plaintiff for the disclosures made in the Letter.   Defendants' cited cases, *Spratt v. Northern Auto. Corp.*, 958 F. Supp. 456, 464 (D. Ariz. 1996), and *Chaboya v. American Nat'l Red Cross*, 72 F. Supp. 2d 1081, 1092-93 (D. Ariz. 1999), do not persuade the Court otherwise because, unlike the plaintiffs in those cases, Plaintiff has produced sufficient evidence linking the contents of his Letter to his termination.   The Court will deny Defendants' motion for summary judgment on this claim.

1    **V.    Count 11 – Good Faith and Fair Dealing.**

2          Plaintiff claims that Defendants breached the implied covenant of good faith and fair

3    dealing implicit in the employment relationship.   Defendants move for summary judgment

4    on the grounds that Plaintiff was not deprived of any benefit of his employment

5    relationship and that Defendants' good faith investigations prior to taking action against

6    Plaintiff absolve them of any liability.   The Court finds both of Defendants' arguments

7    unpersuasive.

8          First, Plaintiff was suspended for 160 hours without pay, which deprived Plaintiff

9    of a contractual benefit he otherwise would have received – compensation.

10         Second, the language of *Almada v. Allstate Ins. Co.*, 153 F. Supp. 2d 1108, 1114 (D.

11   Ariz. 2000), cited by Defendants for their good faith investigation argument, does not fully

12   support their position.   *Almada* recognizes a good faith defense where an employer

13   reaches a conclusion "supported by substantial evidence gathered through an adequate

14   investigation that includes notice of the claimed misconduct and a chance for the employee

15   to respond." *Id.* (citation omitted).   The evidence in the record in this case shows that

16   Defendants undertook a substantial investigation, gathered evidence, and allowed Plaintiff

17   an opportunity to respond.   *Almada* also states, however, that the good faith exception

18   applies where the employer reaches its decision "for reasons that are not arbitrary or

19   pretextual." *Id.*   Plaintiff has created sufficient issues of fact in this case as to whether

20   Defendants' stated reasons for suspending him were merely pretext for retaliation against

21   him for whistleblowing.   Accordingly, the Court cannot conclude as a matter of law that

22   Defendants' reasons were not pretextual and will deny Defendants' motion for summary

23   judgment on this claim.[11]

24

25   _____

26   [11] The Court's First Amendment balancing analysis in Section I.C of this Order, including
     its consideration of the investigation, is part of the legal analysis required under *Pickering*

27   and its progeny.   Plaintiff's argument concerning the alleged pretext of the investigation
     is, in this state-law claim, a factual issue that must be resolved by the jury where there are

28   facts in dispute.

**VI.     Count 12 – Tortious Interference with Contract.**

Plaintiff claims that Defendants McDermott and Harris tortiously interfered with Plaintiff's contract with the City.  Defendants move for summary judgment on the ground that there is no evidence that Defendants acted with an improper motive in firing Plaintiff. The Court disagrees.  As discussed earlier, Plaintiff has raised a question of fact as to whether Defendants improperly acted against him for whistleblowing.  The Court will deny Defendants summary judgment.

**VII.    Count 7 – Intentional Infliction of Emotional Distress.**

Plaintiff claims that Defendants' actions in disciplining him and disseminating unfavorable opinions about him constituted intentional infliction of emotional distress ("IIED").  Defendants move for summary judgment on the ground that Defendants' alleged conduct was not sufficiently outrageous to support an IIED claim.

"It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." *Lucchesi v. Stimmell*, 716 P.2d 1013, 1016 (Ariz. 1986). Plaintiff "may recover for [IIED] only where the defendant's acts are 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Patton v. First Fed. Sav. & Loan Ass'n of Phoenix*, 578 P.2d 152, 155 (Ariz. 1978) (quoting *Cluff v. Farmers Ins. Exch.*, 460 P.2d 666, 668 (Ariz. 1969)); *see also Cummins v. Mold-In Graphic*, 26 P.3d 518, 528 (Ariz. Ct. App. 2001); Restatement (Second) of Torts § 46 cmt. d (1965).

The Court finds that Plaintiff has not established sufficiently outrageous conduct by Defendants.  Defendants' alleged conduct in this case did not exceed the bounds of decency in a civilized society. *See Nelson v. Phoenix Resort Corp.*, 888 P.2d 1375, 1386-87 (Ariz. Ct. App. 1994) (finding insufficient outrageousness where the plaintiff was called into his office at 2 AM, escorted by armed guards to the lobby, and then fired in front camera crews).  Accordingly, the Court will grant Defendants summary judgment on Plaintiff's IIED claim.

1    **VIII.    Count 9 – Negligent Infliction of Emotional Distress.**

2            Plaintiff claims that Defendants' actions during the disciplinary process negligently

3    caused Plaintiff to suffer bodily harm and emotional distress.   Defendants move for

4    summary judgment on the grounds that Plaintiff's emotional and physical symptoms are

5    insufficient to support the claim, and that Arizona courts have not yet recognized negligent

6    infliction of emotional distress ("NIED") in an employment context.

7            The Court finds Plaintiff's alleged symptoms sufficient for his NIED claim to survive

8    summary judgment.   *Monaco v. Healthpartners of S. Arizona*, 995 P.2d 735 (Ariz. Ct. App.

9    1999), cited by Plaintiff, makes clear that "long-term physical illness or mental disturbance"

10   satisfy the NIED bodily harm requirement.   *Id.* at 738-39.   In *Monaco*, the plaintiff suffered

11   prolonged sleeplessness, nightmares, and anxiety, which the court found were sufficient

12   for his NIED claim.   *Id.* at 739.   Plaintiff's expert, Dr. Wilson, opined that Plaintiff suffers

13   comparable long-term symptoms.   *See* PSOF ¶ 295-99.[12]

14           The Court likewise rejects Defendants' argument that Plaintiff cannot sustain his

15   claim because no Arizona court has recognized an NIED claim in the employment context.

16   Under Arizona law, a plaintiff has a cognizable NIED claim against another if:

17               (a) [the tortfeasor] should have realized that his conduct involved an
                 unreasonable risk of causing the distress, otherwise than by knowledge of
18               the harm or peril of a third person, and

19               (b) from facts known to him should have realized that the distress, if it were
                 caused, might result in illness or bodily harm.
20

21   Restatement (Second) of Torts, §§ 313 (adopted by *Ball v. Prentice*, 781 P.2d 628, 630

22   (Ariz. Ct. App. 1989)).   The Restatement puts no limitations on the availability of the tort.

23   If an employer's negligent conduct during a disciplinary process causes an unreasonable

24   _____

25   [12] Defendants move to strike Paragraphs 295 to 299 on the grounds that they are irrelevant,
     lack foundation, or are based on hearsay.   The Court will deny the motion.   The paragraphs
26   are clearly relevant to whether Plaintiff has suffered bodily harm.   Dr. Wilson made his
     observations based on professional interviews with Plaintiff and provides a direct opinion
27   connecting Defendants' alleged behavior with Plaintiff's symptoms.   Dr. Wilson's opinion
28   is not hearsay.

1    risk of bodily harm to another, the employer appears to be liable under the Restatement.

2    Defendants offer no contrary citation to Arizona cases.   The Court will deny summary

3    judgment on this claim.

4    **IX.      Quasi-judicial Immunity for McDermott.**

5          Defendant McDermott moves for summary judgment on all of Plaintiff's claims,

6    asserting the defense of absolute quasi-judicial immunity.   McDermott asserts the defense

7    based on *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 923 (9th Cir. 2004), which

8    reaffirmed the availability of the defense in § 1983 actions.

9          The Court will deny McDermott's motion.   By granting summary judgment on

10   Plaintiff's First Amendment claim, the Court has eliminated any § 1983 claim to which the

11   defense described in *Olsen* could apply.   The remaining claims are based on Arizona state

12   law.   McDermott acknowledges in his reply brief that "Arizona courts have abandoned the

13   doctrine of quasi-judicial immunity for state law claims brought against public officials."

14   Reply Brief, dated May 23, 2005, at 1.   McDermott argues in his reply for qualified immunity

15   based on communicative acts, and that all state-law claims against him fail because Plaintiff

16   has abandoned his defamation claim against McDermott.   The Court will not consider these

17   arguments because they were not raised in the original motion.

18   **X.      Defendants' Motion to Strike Dr. Wilson's Supplemental Report.**

19         Defendants move to strike Plaintiff's supplemental expert report from Dr. Wilson,

20   disclosed on January 6, 2005, arguing that the report came well after the Court's

21   November 30, 2004 deadline for expert discovery.   The Court will grant the motion.   The

22   Court's scheduling order clearly established a deadline for expert discovery.   Plaintiff

23   designated Dr. Wilson as a Rule 26(a)(2)(B) witness in his Sixth Supplemental Disclosure

24   Statement on August 26, 2004, and Defendants deposed Dr. Wilson before the deadline,

25   on September 16, 2004.   Dr. Wilson's supplemental report is late.

26         Plaintiff makes two arguments.   First, Plaintiff argues that the issue of the

27   supplemental report is really a discovery dispute that Defendants should have addressed

28   in a conference call with the Court as specified in the Case Management Order.   Although

1  Defendants could have raised the issue in a conference call, non-compliance with the

2  Court's scheduling orders may also be raised in dispositive motion briefing.

3          Second, Plaintiff argues that because Dr. Wilson, as Plaintiff's treating physician,

4  was not technically subject to the Rule 26(a)(2) expert disclosure rules, Dr. Wilson should

5  not be subject to the Court's deadline for expert disclosure.  The Court disagrees.  This is

6  a not a situation where Defendants are seeking to characterize Dr. Wilson as a Rule 26(a)(2)

7  expert to take advantage of Plaintiff.  Plaintiff himself designated Dr. Wilson as an expert

8  in this case and now seeks to re-characterize Dr. Wilson to avoid a strict deadline.

9  Moreover, Rule 701 of the Federal Rules of Evidence states that opinion testimony must

10 be presented under Rule 702 if it is based on specialized knowledge within the scope of

11 Rule 702, and Rule 26(a)(2)(A) in turn requires the disclosure of expert reports for all Rule

12 702 witnesses.  The motion to strike will be granted.

13 **XI.    Plaintiff's Motion to Strike Expert Witness Ken Katsaris.**

14         Defendants seek to use the testimony of Ken Katsaris, a former law enforcement

15 officer, as expert testimony regarding the appropriateness of Defendants' response to

16 Plaintiff's Letter.  Plaintiff moves to strike Mr. Katsaris as an expert or, in the alternative,

17 strike portions Mr. Katsaris' affidavit containing inadmissible statements.  Because the

18 Court has not used any portion of Mr. Katsaris' testimony in resolving the pending

19 summary judgment motions, the Court will deny the motion to strike as moot.  Plaintiff may

20 raise the issue again in a motion in limine before trial.

21 **XII.   The Court Will Remand the Remaining State-law Claims.**

22         By dismissing Plaintiff's First Amendment claim, and by the previous dismissal of

23 the federal OSHA claim, the basis for this Court's federal question jurisdiction has been

24 eliminated.  The Court now must decide whether to continue to exercise supplemental

25 jurisdiction over Plaintiff's remaining state-law claims.  The relevant statute, 28 U.S.C.

26 § 1367(c), provides that "[t]he district courts may decline to exercise supplemental

27 jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all

28 claims over which it has original jurisdiction."

"While discretion to decline to exercise supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in § 1367(c), it is informed by the *Gibbs* values 'of economy, convenience, fairness, and comity.'" *Acri v. Varian Assocs.*, 114 F.3d 999, 1000 (9th Cir. 1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353 (1988)). "The Supreme Court has stated, and we have often repeated, that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Id.* (quoting *Carnegie-Mellon*, 484 U.S. at 350 n. 7).

The Court concludes that the *Gibbs* factors favor remand of this case to state court. Considerations of comity are particularly relevant. Plaintiff asserts a host of state-law claims, some of them novel. Arizona courts have a greater interest in resolving such claims, their inherent expertise in state-law matters will ensure a proper resolution of this case, and remand likely will afford Arizona appellate courts an opportunity to further develop Arizona law regarding whistleblowers, wrongful termination, and emotional distress torts.

Economy will be served as well. Discovery has been completed, dispositive motions resolved, and the case is now ready for trial. Remand will benefit the federal system by allowing this Court to devote its scarce resources to resolving federal issues and developing federal law. Fairness will be ensured by trial in a court more familiar with state-law issues and appellate review in courts with the same expertise. Although some minor inconvenience may be incurred in the transfer to state court, that inconvenience is outweighed by these other considerations. Therefore, pursuant to 28 U.S.C. §§ 1367(c) and 1447(c), this case will be remanded to state court.

**IT IS ORDERED:**

1.  Plaintiffs' Motion for Partial Summary Judgment (Doc. #171) is **denied**.

2.  Defendants' Motion for Summary Judgment Re Count I (First Amendment) (Doc. #173) is **granted**.

3.  Defendants' Motion for Summary Judgment Re Counts IV, VI, VII, IX, XI, XII,

1  and Punitive Damages (Doc. #174) is **granted in part and denied in part**.

2  　　　　4.　　Defendants' Motion for Summary Judgment Re Quasi-Judicial Immunity for

3  Defendant McDermott (Doc. #175) is **denied**.

4  　　　　5.　　Defendants' Motion for Summary Judgment Re Counts VIII and X (Doc.

5  #176) is **granted**.

6  　　　　6.　　Plaintiff's Motion to Strike Expert Witness Ken Katsaris and Motion to Strike

7  Portions of Defendants' Statement of Facts (Doc. #182) is **denied as moot**.

8  　　　　7.　　Plaintiff's Motion to Strike Portions of Defendants' Statement of Facts (Doc.

9  #183) is **denied**.

10  　　　　8.　　Defendants' Motion to Strike Wilson Supplemental Report (Doc. #210) is

11  **granted**.

12  　　　　9.　　Defendants' Motion to Strike (Doc. #211) is **denied**.

13  　　　　10.　　This case is remanded to Arizona state court for further proceedings.   The

14  Clerk shall transfer the file to Maricopa County Superior Court and terminate this action.

15  　　　　DATED this 27th day of September, 2005.

16

17

18

19  　　　　　　　　　　　　　　　　　David G. Campbell

20  　　　　　　　　　　　　　　　　　United States District Judge

21

22

23

24

25

26

27

28